# In the United States District Court
## for the Middle District of North Carolina

| | |
|---|---|
| Common Cause, *et al.*,<br><br>                             Plaintiffs,<br><br>    v.<br><br>Robert A. Rucho, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the Joint Select Committee on Congressional Redistricting, *et al.*,<br><br>                             Defendants. | Civil Action<br>No. 1:16-CV-1026-WO-JEP<br><br>Three-Judge Court |
| League of Women Voters of North Carolina, *et al.,*<br><br>                             Plaintiffs,<br><br>    v.<br><br>Robert A. Rucho, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the 2016 Joint Select Committee on Congressional Redistricting, *et al.,*<br><br>                             Defendants. | Civil Action<br>No. 1:16-Cv-1164-wo-jep<br><br>Three Judge Panel |

## REPLY BRIEF IN SUPPORT OF LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF SEAN P. TRENDE

## TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

ARGUMENT ....................................................................... 3

I.  Defendants Implicitly Concede the Validity of Plaintiffs' Criticisms. ................ 3

II.  *Daubert* Is Not Rendered Inapplicable in Bench Trials. ...................... 6

III. Trende's Meager Experience Does Not Qualify Him. ........................................ 8

IV. Defendants' Description of Trende's Testimony Shows Why It Should
Be Excluded. .................................................................................................... 11

CONCLUSION ........................................................................................................ 15

Case 1:16-cv-01164-WO-JEP   Document 76   Filed 07/17/17   Page 2 of 21

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Ala. Legis. Black Caucus v. Alabama,*
135 S. Ct. 1257 (2015) ........................................................................ 13

*Boltar, L.L.C. v. C.I.R.,*
136 T.C. 326 (2011) ......................................................................... 6.7

*Daubert v. Merrell Dow Pharm., Inc.,*
509 U.S. 579 (1993) ................................................................... *passim*

*LULAC v. Perry,*
548 U.S. 399 (2006) .................................................................. 3, 13, 14

*Norfolk & Portsmouth Belt Line R. Co. v. M/V MARLIN,*
2009 WL 3363983 (E.D. Va. Oct. 9, 2009) ............................................ 7

*Seaboard Lumber Co. v. United States,*
308 F.3d 1283 (Fed. Cir. 2002) ............................................................ 6

*Sunland Constr. Co. v. City of Myrtle Beach,*
2007 WL 2822509 (D.S.C. Sept. 26, 2007) ............................................ 6

*United States v. Johnson,*
122 F. Supp. 3d 272 (M.D.N.C. 2015) .................................................. 7

*Whitford v. Nichol,*
151 F. Supp. 3d 918 (W.D. Wis. 2015) (*Whitford I*) ............................. 10

*Whitford v. Gill,*
218 F. Supp. 3d 837 (W.D. Wis. 2016) (*Whitford II*) ...................... *passim*

*Wright v. United States,*
280 F. Supp. 2d 472 (M.D.N.C 2003) .................................................. 7

**Rules**
Federal Rule of Evidence 702 ................................................... *passim*

**Other authorities**

Charles Alan Wright, et al.,
Federal Practice & Procedure § 5037.10 (2d ed. 2005) ........................... 7

Case 1:16-cv-01164-WO-JEP   Document 76   Filed 07/17/17   Page 3 of 21

# INTRODUCTION

In their brief in support of their motion to exclude the testimony of Sean P. Trende, plaintiffs made two separate arguments for exclusion. *First*, Trende is not qualified to serve as an expert in this case by his education, training, knowledge, skill, or experience. He is a first-year political science graduate student who writes columns for an online politics website. He has never published a peer-reviewed article on any topic. He misunderstands the very measures of partisan gerrymandering—the efficiency gap and partisan bias—that are at issue in this litigation. And he makes error after error when he tries to compute these metrics or to conduct any other analysis.

*Second*, the opinions that Trende seeks to offer are fundamentally unreliable. Some are based on anecdotes rather than statistical examination, like his claim (backed by nothing more than a series of cherry-picked cases) that control of the redistricting process does not yield a favorable efficiency gap. Others are ipse dixit conclusions unsullied by any data: for example, his assertion that the efficiency gap is equivalent to proportional representation. And still others are marred by basic methodological mistakes: for instance, his calculation of the efficiency gap without "consider[ing] the known or potential rate of error." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594 (1993).

One might think that defendants would have engaged with these arguments in an effort to rehabilitate Trende's testimony. One would be wrong. Defendants do not identify any qualifications that plaintiffs failed to mention. Nor do they contend that

1

Trende understands the metrics he opines on or did not make the errors that plaintiffs pointed out. And most damningly, nor do defendants actually *defend* any of Trende's challenged opinions. Their silence on this front is deafening. If defendants cannot explain why these opinions are reliable, how can this Court be expected to rely on them?

Rather than respond to plaintiffs' arguments, defendants suggest, first, that *Daubert* is somehow inapplicable in bench trials. This is a preposterous claim. Unqualified experts offering unreliable opinions are as out of place in front of judges as before juries. For this reason, courts have had no qualms about excluding expert testimony even when they are the finders of fact.

Defendants also cite Trende's activities prior to graduate school as well as his involvement in a Wisconsin partisan gerrymandering case, *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016) (*Whitford II*). But Trende's earlier activities did not include *any* quantitative analysis of redistricting or partisan gerrymandering—the kind of work that would be relevant here. The *Whitford* court also dismantled Trende's opinions about the impact of political geography: so much so that he says not a word about the subject here.

Lastly, defendants devote most of their brief to outlining the testimony that Trende would give at trial. They thus show exactly why that testimony should be excluded. It appears that Trende would discuss California's 1984 congressional plan, Texas's 2004 plan, Washington's 1992 plan, and a couple others. It appears, that is, that Trende would double down on the very use of misleading anecdotes that renders his opinions unreliable.

2

Trende would also evidently comment on a series of doctrinal issues: how *LULAC v. Perry*, 548 U.S. 399 (2006), would have been decided under plaintiffs' proposed test, the usefulness of the test's intent prong, whether measures of partisan symmetry are precluded by the Supreme Court's racial gerrymandering cases, and so on. These are obviously legal matters as to which this Court has no need for Trende's thoughts.

It further seems that Trende would replow the same ground that defendants covered at Professor Simon Jackman's deposition: the various factors that can affect the efficiency gap, how an efficiency gap threshold might be set, how different scholars have computed the measure, and the like. These are perfectly appropriate topics for cross-examination. But it would be redundant for Trende to testify about them. It would also be improper given his lack of qualifications and his opinions' (apparently uncontested) unreliability.

This Court should therefore exclude Trende's expert report and any testimony offered by Trende at trial. He fails to satisfy the requirements for the introduction of expert testimony set forth by *Daubert* and Federal Rule of Evidence 702.

## ARGUMENT

## I. Defendants Implicitly Concede the Validity of Plaintiffs' Criticisms.

In their opening brief, plaintiffs laid out the many reasons why Trende is unqualified to serve as an expert in this case and why his opinions are unreliable. Defendants failed to respond to most of these points, and thus implicitly concede their validity. To highlight defendants' non-responsiveness, plaintiffs list below their major

3

critiques of Trende's qualifications and opinions, and then note defendants' meager (or nonexistent) rejoinders:

- Trende is a first-year graduate student who writes columns for an online politics website and has never published a peer-reviewed article. Br. in Support of League of Women Voters of North Carolina Plaintiffs' Motion in Limine to Exclude the Testimony of Sean P. Trende ("Pls' Br.") at 5-7. Defendants do not identify any other qualifications that Trende possesses. Defendants' Brief in Opposition to Plaintiffs' Motion in Limine to Strike the Testimony of Sean Trende at Trial ("Defs' Br.") at 4-6.

- Trende's experience with redistricting is limited to tracing the boundaries of congressional districts. He has not conducted any quantitative analysis of redistricting or partisan gerrymandering. Pls' Br. at 7-8. Defendants concur. Defs' Br. at 5.

- Trende lacks basic knowledge about measures of partisan gerrymandering. He incorrectly defines partisan bias. He cannot name the formula for calculating the simplified form of the efficiency gap. He does not know how to determine a plan's efficiency gap from its seat-vote curve. Pls' Br. at 9-13. Defendants' only response is that the rules do not "require him to be an expert on existing political science literature." Defs' Br. at 14. Maybe not, but they *do* require familiarity with the fundamental concepts at issue in the case.

4

- Trende made errors when calculating the efficiency gap and cannot say which of his files contains the correct values. He also made mistakes when carrying out his sensitivity testing and warns plaintiffs not to use the file he disclosed. Pls.' Br. at 13-14. Defendants' only response is that Trende does not "claim to have never made a mistake." Defs' Br. at 14.

- Trende relies exclusively on cherry-picked anecdotes when he addresses the impact of party control of redistricting on the efficiency gap. He conducts no statistical examination even though he admits that a regression model is the right approach to this issue. Pls' Br. at 17-20. Defendants say nothing at all to show that this opinion is reliable. Indeed, as discussed below, they double down on the use of anecdotes in place of rigorous analysis.

- Trende offers no facts or data to support his claim that minor technical variations in how the efficiency gap is computed make a substantive difference. Nor does he present any facts or data to back his assertion that the efficiency gap is equivalent to proportional representation. Pls' Br. at 21-22. Defendants say nothing at all to show that these opinions are reliable.

- Trende's methods are flawed when he lists congressional plans whose efficiency gaps do not flip signs because he fails to consider the uncertainty associated with each efficiency gap estimate. His methods are also flawed when he carries out sensitivity testing because he bases his testing on national (rather than state) election results and fails to take into account the likelihood of different outcomes.

5

Pls' Br. at 24-26. Defendants say nothing at all to show that these techniques are reliable.

As noted at the outset, defendants' most telling silence is with respect to the reliability of Trende's opinions. They simply make no effort whatsoever to explain why, despite plaintiffs' criticisms, the opinions are actually trustworthy. In the face of this silence, this Court must exclude the opinions. Otherwise the Court would find itself in the untenable position of depending on opinions that defendants themselves cannot defend.

## II.    *Daubert* Is Not Rendered Inapplicable in Bench Trials.

Rather than engage with plaintiffs' arguments, defendants first suggest that *Daubert* does not apply in bench trials. Defs' Br. at 3-4. Defendants have to make this suggestion with a wink and a nod because it is indisputable that *Daubert* does, in fact, govern bench trials. *See, e.g.*, *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002) ("[T]he *Daubert* standards of relevance and reliability for scientific evidence must nevertheless be met [in bench trials]."); *Boltar, L.L.C. v. C.I.R.,* 136 T.C. 326, 334 (2011) ("[R]ule 702 of the Federal Rules of Evidence applies to bench trials as well as to jury trials . . . ."); *Sunland Constr. Co. v. City of Myrtle Beach*, 2007 WL 2822509, at *3 (D.S.C. Sept. 26, 2007) (rejecting defendants' argument "that the *Daubert* standards of relevance and reliability may be lessened during a bench trial").

The *reason* why *Daubert* remains meaningful in bench trials, of course, is that inadmissible expert testimony is highly problematic whether the factfinder is a judge or a jury. An expert who is unqualified or who offers unreliable opinions wastes the time of

6

the opposing party and the court. The opposing party must expend resources responding to the putative expert's statements. The court must also consider those statements, and devote valuable trial time to the expert that could have been spent hearing admissible evidence. The entire trial process would function better if the expert had simply been excluded from the outset. *See, e.g.*, *Boltar*, 136 T.C. at 334 ("[R]eceipt of unreliable evidence is an imposition on the opposing party and on the trial process."); 21 Charles Alan Wright, et al., Federal Practice & Procedure § 5037.10, at 763-64 (2d ed. 2005) (excluding experts "fosters efficiency by saving time at trial and saves parties the costs of bringing witnesses to court who will not be allowed to testify or whose testimony will not be needed").

Precisely because *Daubert* does apply in bench trials, courts in this district and elsewhere in the Fourth Circuit have not hesitated to reject expert testimony even when they are the finders of fact. They have not relaxed or waived *Daubert* simply because no jury was involved. *See, e.g.*, *United States v. Johnson*, 122 F. Supp. 3d 272, 336 (M.D.N.C. 2015) ("[T]he court is not persuaded that [the expert's] opinions are sufficiently reliable and valid to be admissible . . . ."); *Norfolk & Portsmouth Belt Line R. Co. v. M/V MARLIN*, 2009 WL 3363983 at *7 (E.D. Va. Oct. 9, 2009) (concluding that the defendant "failed to put forth sufficient evidence to demonstrate that [the witness] is qualified to testify as an expert"); *Wright v. United States*, 280 F. Supp. 2d 472, 480 (M.D.N.C 2003) (excluding an expert who had "clinical limitations" that rendered him "incapable of explaining" a key issue in the case).

7

### III. Trende's Meager Experience Does Not Qualify Him.

After misconstruing *Daubert*, defendants exaggerate Trende's qualifications. They state that he has worked at Real Clear Politics "for nearly two decades." Defs' Br. at 5. In fact, he has penned columns for this online politics website only since 2009 (and only since 2010 in a full-time capacity). Expert Report of Sean P. Trende ("Trende Rep.") ¶ 10. They claim that Trende wrote the North Carolina section of the *2014 Almanac of American Politics*. Defs' Br. at 5. In fact, Trende testified at his deposition that he did *not* author the "state summary" for North Carolina (which was written by Michael Barone) or the "congressional redistricting summary" (which was written by Dave Wasserman). Deposition of Sean P. Trende ("Trende Dep.") 167:21-168:3.

Defendants further assert that Trende has "learn[ed] how congressional redistricting and gerrymandering have worked over the years" by "plott[ing] every congressional district ever drawn." Defs' Br. at 5. But stenciling the borders of congressional districts—with Adobe Illustrator rather than GIS software—could only have taught Trende what they look like. It could not have given him the kind of experience that is actually relevant here: analyzing redistricting and gerrymandering *quantitatively*, using large volumes of data and proper statistical techniques. And defendants present Trende as "an expert . . . in the discipline of psephology (the scientific study of elections)." *Id.* at 6. But Trende himself no longer purports to be a psephologist, because he recognizes that are no journals of psephology and no universities that grant

8

degrees in this so-called field. Trial Tr. (Day Four) 91:19-92:19, *Whitford II*, 218 F.
Supp. 3d 837 (W.D. Wis. 2016) (No. 1:2015-cv-421-bbc).

Defendants also try to shore up Trende's qualifications by noting his involvement
in *Whitford*, the Wisconsin partisan gerrymandering case. Defs' Br. at 6, 14. This effort is
unavailing for several reasons. First, the bulk "of Mr. Trende's testimony [in *Whitford*]
concerned the political geography of Wisconsin" and the natural advantage it supposedly
confers to Republicans. 218 F. Supp. 3d at 913. Here, however, Trende does *not* examine
North Carolina's political geography. In fact, he does not include *any* of the geographic
analyses that he carried out in *Whitford*. Thus the fact that the *Whitford* court deemed
these analyses "'shaky but admissible'" is irrelevant here, where the analyses are not
even offered. *Id.* at 912 n.319.

Second, the *Whitford* court found Trende's work to be shaky indeed. It labeled
"valid" the plaintiffs' "criticisms" that "identified several . . . flaws in the methodologies
that Mr. Trende used to form his opinions." *Id.* It was "skeptical" of a series of maps that
Trende created and called them "worthy of little, if any, weight" because they cannot
"serve as a substitute for quantitative data." *Id.* at 913. And it ruled that Trende's so-
called "nearest neighbor analysis" did "not provide the level of analytical detail
necessary," and "question[ed] how useful Mr. Trende's . . . analysis is in the context of
this case." *Id.* at 914-15. The *Whitford* court's judgment is therefore consistent with
plaintiffs' position here: Because Trende lacks sufficient training and experience, his
analytical methods are flawed and unreliable.

9

And third, the *Whitford* court not only dissected the opinions that Trende offered in that case, it also rebutted the ones he presents here. Consider his argument that "there is no single 'efficiency gap,' making it difficult to choose a standard." Trende Rep. at 7. The *Whitford* court found that the simplified form of the efficiency gap is "'an appropriate and useful summary measure'" and "correlate[s] highly with both the full method and electoral reality." *Whitford II*, 218 F. Supp. 3d at 907. Or take Trende's assertion that the "[t]he efficiency gap is proportional representation for first-past-the-post systems." Trende Rep. at 12. The *Whitford* court explained that "the efficiency gap is about comparing the wasted votes of each party, not determining whether the party's percentage of the statewide vote share is reflected in the number of representatives that party elects successfully." *Whitford v. Nichol*, 151 F. Supp. 3d 918, 929 (W.D. Wis. 2015) (*Whitford I*); *see also id.* at 929-30 (noting that "an election's results may have a small efficiency gap without being proportional or they may be proportional and still have a large efficiency gap").

As for the centerpiece of Trende's report—his list of anecdotes where plans designed by a single party exhibit small efficiency gaps and maps crafted by neutral actors exhibit large ones, Trende Rep. at 29-61—the *Whitford* court pinpointed the defect of this mode of analysis. When plaintiffs' entire three-part test is applied, it yields the right result in each case, with liability following only if there is discriminatory intent, a large and durable discriminatory effect, and an absence of a legitimate justification:

10

> The defendants also contend that the EG, as an indicator of partisan gerrymandering, is both overinclusive and underinclusive. . . . We do not share this particular concern. If a nonpartisan or bipartisan plan displays a high EG, the remaining components of the analysis will prevent a finding of a constitutional violation. For example, if a claim of partisan gerrymandering is brought against a court- or commission-drawn district plan with a high EG, it will stall when the plaintiffs attempt to make the necessary showing of discriminatory intent. In the same way, a challenge to a map enacted with egregious partisan intent but demonstrating a low EG also will fail because the plaintiffs cannot demonstrate the required discriminatory effect.

*Whitford II*, 218 F. Supp. 3d at 908. The *Whitford* court thus did not, as defendants claim, "acknowledge[] several points made by Mr. Trende . . . as valid criticisms of the efficiency gap." Defs' Br. at 6. To the contrary, it made clear why these points (which are repeated nearly verbatim in this litigation) are invalid.

## IV. Defendants' Description of Trende's Testimony Shows Why It Should Be Excluded.

Defendants' final tack is to describe the testimony that Trende would give at trial if admitted as an expert. Defs' Br. at 6-15. This discussion is largely irrelevant because it establishes neither that Trende is qualified nor that his opinions are reliable. Rather, it amounts to a recapitulation of Trende's report. Defendants' account of Trende's testimony also highlights why it should be excluded. All of it either (1) repeats the errors that infect Trende's analyses; (2) is legal rather than factual in nature; or (3) should be covered in Professor Jackman's cross-examination.

To begin with, it appears that Trende would emphasize a few of the cherry-picked anecdotes from his report. He would comment on a California plan that exhibited a low efficiency gap despite supposedly being enacted with discriminatory intent, *id.* at 7-8;

11

two North Carolina maps that also allegedly fit this pattern, *id.* at 8-10; a Texas plan that was motivated by partisan advantage and exhibited a large efficiency gap, *id.* at 9; and commission-drawn maps in New Jersey and Washington that exhibited large efficiency gaps, *id.* at 10-11.

Defendants thus make clear that Trende has not learned from his previous mistakes but rather intends to make them again. Criticized by plaintiffs—without any rebuttal from defendants—for relying on misleading anecdotes instead of systematic quantitative analysis, Trende plans once more to ignore the forest and to focus on a handful of trees. He would not compare the efficiency gaps of plans designed under unified government with the efficiency gaps of plans crafted under other conditions. He would not run regressions with the efficiency gap as the dependent variable and the institutions responsible for redistricting as the independent variables. He would not do anything other than tell stories based on a smattering of unrepresentative examples. This is simply not the stuff of reliable expert testimony.

Moreover, even on their own terms, Trende's examples are handled perfectly well by plaintiffs' proposed test. Consider the California plan and the two North Carolina maps that were supposedly enacted with discriminatory intent and then exhibited low efficiency gaps. There *should* not be liability under these conditions, where neither party is, in fact, significantly disadvantaged by a district plan. And there *would* not be liability under plaintiffs' test. Or take the Texas map that was motivated by partisan gain and then exhibited a large and durable efficiency gap. Assuming there was no legitimate

12

justification for the plan's skew, it should be and it would be unlawful under plaintiffs'
test. This result, of course, in no way contradicts the Supreme Court's judgment in
*LULAC*, which dealt only with the manageability of the appellants' proposed standard—
not the validity of the map itself. And as for the commission-drawn plans in New Jersey
and Washington with large efficiency gaps, the *Whitford* court put it well: "[I]f a claim of
partisan gerrymandering is brought against [such maps], it will stall when the plaintiffs
attempt to make the necessary showing of discriminatory intent." *Whitford II*, 218 F.
Supp. 3d at 908.

Next, it seems that Trende would testify about a range of legal issues. He would
argue that, under plaintiffs' test, "the five Justices who concluded that *LULAC* did not
involve an unacceptable partisan gerrymander simply got it wrong." Defs' Br. at 9. He
would state that the test's discriminatory intent prong is "naïve about the way litigation
works." *Id.* at 11. And he would point out that "[t]he Supreme Court has recently
criticized the use of mechanical formulas" in *Ala. Legis. Black Caucus v. Alabama*, 135
S. Ct. 1257 (2015). *Id.* at 11.

Needless to say, these are matters that defendants' counsel may address in briefing
and closing argument, but they are *not* suitable subjects for expert testimony. In his
report, interestingly, Trende made some effort to refrain from legal commentary. *See*
Trende Rep. ¶ 33 ("a court could ultimately settle upon an efficiency gap [threshold]");
*id.* ¶ 75 (how to evaluate Professor Jackman's prognostic tests "is ultimately a question
for the courts and lawyers, not the experts"). In preparation for trial, however, defendants

13

have evidently forgotten about the boundary between expert opinion and legal argumentation.

As for the merits of Trende's legal claims, they are obviously flawed. As noted above, *LULAC* involved the manageability of a different gerrymandering standard, so no Justice could have "got it wrong" under plaintiffs' test. Similarly, if it is "naïve" for causes of action to include discriminatory intent prongs, then huge swathes of First Amendment and Fourteenth Amendment doctrine would have to be discarded. The *Whitford* court also had no trouble applying this prong and finding it satisfied. *See Whitford II*, 218 F. Supp. 3d at 883-98. And that it was legal error for states to crudely freeze districts' minority population shares in an attempt to comply with Section 5 of the Voting Rights Act hardly means that all quantitative metrics are now banned. If they were, that would certainly be news to the reapportionment and racial vote dilution litigants who continue to rely on them.

Finally, defendants say that Trende would testify about some of the topics that came up during Professor Jackman's deposition. These include the factors other than discriminatory intent that can affect the efficiency gap, Defs' Br. at 6; the efficiency gap thresholds that Professor Jackman recommends, *id.* at 7-10; technical variations in how the efficiency gap is calculated, *id.* at 12; and the efficiency gap's applicability to states with small congressional delegations, *id.* at 13. *See also id.* at 13 (referring repeatedly to Professor Jackman's statements at his deposition).

Plainly, defendants are free to cross-examine Professor Jackman on these issues and any others that may have piqued their interest. But equally plainly, what Professor Jackman did or didn't say at his deposition is not something about which *Trende* can provide expert testimony. For the reasons discussed earlier, Trende also should not be allowed to opine generally about Professor Jackman's methods. He is starkly unqualified to do so, and his lack of expertise is manifest in his own shoddy analyses. And as to the merits of Professor Jackman's work, defendants' criticisms are unfounded. No one denies, for example, that factors other than discriminatory intent affect the efficiency gap; it is a measure of partisan *advantage*, not of partisan *motivation*. It is also undisputed— indeed, confirmed by Trende, *see* Trende Rep. ¶ 48—that it makes no substantive difference which technique is used to compute the efficiency gap. And there is no arithmetical obstacle to determining efficiency gaps for states with fewer seats; there is only the practical reality that each seat in these states accounts for a larger fraction of the total delegation size.

## CONCLUSION

For the foregoing reasons, this Court should strike Trende's report in its entirety and exclude his testimony at trial.

Respectfully submitted this 17th day of July, 2017.

<div style="margin-left:50%">

/s/ Anita S. Earls
Anita S. Earls (State Bar # 15597)
Allison J. Riggs (State Bar # 40028)
Emily Seawell (State Bar # 50207)
Southern Coalition for Social Justice
anitaearls@southerncoalition.org

</div>

15

allisonriggs@southerncoalition.org
emilyseawell@southerncoalition.org
1415 Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3380 ext. 115
Facsimile: 919-323-3942
Counsel for All Plaintiffs

/s/ Ruth M. Greenwood
Paul M. Smith
Ruth M. Greenwood
Annabelle Harless
Campaign Legal Center
1411 K Street NW, Suite 1400
Washington, DC 20005
(202) 736-2200
ghebert@campaignlegalcenter.org
rgreenwood@campaignlegalcenter.org
aharless@campaignlegalcenter.org

/s/ Nicholas O. Stephanopoulos
Nicholas O. Stephanopoulos
University of Chicago Law School
1111 E 60th St.
Chicago, IL 60637
(773) 702-4226
nsteph@uchicago.edu

16

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing via electronic mail, addressed to counsel for all parties in this consolidated action.

This the 17th day of July, 2017.

/s/ Ruth M. Greenwood

Ruth M. Greenwood

17

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

I hereby certify that this brief complies with L.R. 7.3(d) because the total word count for the body of the brief including headings and footnotes is 3,909.


This the 17th day of July, 2017.

/s/ Ruth M. Greenwood

Ruth M. Greenwood