IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT A. RUCHO, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the 2016 Joint Select Committee on Congressional Redistricting, *et al.*,<br><br>Defendants. | CIVIL ACTION<br>NO. 1:16-CV-1164<br><br>THREE-JUDGE COURT |

**LEAGUE OF WOMEN VOTERS PLAINTIFFS' BRIEF**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................ 2

    I.    *Whitford* Held That Vote Dilution Plaintiffs Must Show That They Live in Unnecessarily Cracked or Packed Districts. ..................................... 2

    II.    *Whitford* Has No Impact on the Court's First Amendment and Article I Holdings. ................................................................................................ 6

    III.    The Existing Factual Record Is Not Quite Adequate to Establish Plaintiffs' Standing to Bring Their Vote Dilution Claim. .............................. 7

    IV.    The Court Should Authorize the Limited and Expedited Reopening of the Record to Enable Plaintiffs to Prove Their Standing. ........................ 10

    V.    The Court Should Briefly Reopen the Record Before Deciding Whether Plaintiffs Have Standing. .................................................................. 13

CONCLUSION ...................................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Brown v. Thomson*,
462 U.S. 835 (1983) ....................................................................................................5

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) .........................................................................................*passim*

*Karcher v. Daggett*
462 U.S. 725 ................................................................................................................5

*League of United Latin Am. Citizens v. Perry*,
548 U.S. 399 (2006) ....................................................................................................5

*Thornburg v. Gingles*,
478 U.S. 30 (1986) ......................................................................................................5

# INTRODUCTION

In *Gill v. Whitford*, 138 S. Ct. 1916 (2018), the Supreme Court clarified the standing requirements that apply to plaintiffs bringing partisan gerrymandering claims on a vote dilution theory. To establish an injury in fact, the Court held, such plaintiffs must live in districts that *are*—but did not *have* to be—cracked or packed. The Court also explained that the remedy in a vote dilution case must fit the harm. Districts must be redrawn, that is, so as to correct the needless cracking and packing shown by plaintiffs. However, the Court did not address the issue of justiciability. Nor did it discuss other kinds of partisan gerrymandering theories, like those alleging burdens on First Amendment associational rights or a breach of Article I of the Constitution.

In its order dated June 27, 2018, this Court asked the parties to submit briefing on four questions about *Whitford*'s implications for this case. The answers of the League of Women Voters of North Carolina's ("League"), in a nutshell, are as follows: *First*, *Whitford* has no impact on this Court's holdings that North Carolina's current congressional plan (the "2016 Plan") violates the First Amendment and Article I. Nor does it undermine the Court's conclusion that the 2016 Plan constitutes unlawful vote dilution under the Equal Protection Clause. *Second*, the existing factual record is not quite adequate to establish plaintiffs' standing to challenge the Plan on vote dilution grounds. While the record amply demonstrates the deliberate cracking and packing of Democratic voters throughout North Carolina, it does not specify where the cracking and packing could have been *avoided* had defendants not designed a gerrymandered map.

1

*Third*, to show where the cracking and packing could have been avoided, the Court should admit into evidence additional information about the district maps that were previously generated by the League's expert. This information consists of two short declarations, one from Professor Jowei Chen and the other from League representative Walter Salinger, which offer no new analyses and simply disclose more data about testimony and stipulations that are already in the record. Together, the declarations enable the identification of individual plaintiffs and/or League members who were placed in cracked or packed districts by the 2016 Plan but who could have been assigned to uncracked or unpacked districts by a fair map. And *fourth*, because this further factual development is necessary, the Court should authorize the limited—and expedited—reopening of the record before making any final determination as to plaintiffs' standing.

## ARGUMENT

### I. *Whitford* Held That Vote Dilution Plaintiffs Must Show That They Live in Unnecessarily Cracked or Packed Districts.

Before addressing this Court's questions about *Whitford*, the League briefly summarizes the Supreme Court's decision and what it means for partisan gerrymandering claims alleging vote dilution. In *Whitford*, the Supreme Court resolved the ambiguity that had existed as to who has standing to sue on a vote dilution theory. The Court unanimously held that only plaintiffs living in cracked or packed districts—and so *not* all supporters of the victimized party—have standing. As the Court put it, a vote dilution plaintiff must "prove that he or she lives in a cracked or packed district." *Whitford*, 138 S. Ct. at 1932. Or in the words of Justice Kagan's concurrence, "a plaintiff asserting a
2

partisan gerrymandering claim based on a theory of vote dilution must prove that she lives in a packed or cracked district in order to establish standing." *Id.* at 1934 (Kagan, J., concurring).

Importantly, both the majority opinion and the concurrence insisted on proof of cracking or packing *relative to another district configuration*. Plaintiffs living in cracked or packed districts, in other words, must show that they could have been uncracked or unpacked by a different map. The Court explained that the "harm" of vote dilution arises when a plaintiff's vote, "having been packed or cracked . . . carr[ies] less weight than it would carry in another, hypothetical district." *Id.* at 1931. Justice Kagan elaborated that, to "prov[e] packing or cracking, a plaintiff could produce an alternative map (or set of alternative maps)—comparably consistent with traditional districting principles—under which her vote would carry more weight." *Id.* at 1936 (Kagan, J., concurring). "For example, a Democratic plaintiff living in a 75%-Democratic district could prove she was packed by presenting a different map, drawn without a focus on partisan advantage, that would place her in a 60%-Democratic district." *Id.* "Or conversely, a Democratic plaintiff residing in a 35%-Democratic district could prove she was cracked by offering an alternative, neutrally drawn map putting her in a 50-50 district." *Id.*

Notably, the *Whitford* Court did not opine on the legal standard that should govern vote dilution claims. The Court observed that the theory's "contours and justiciability . . . are unresolved." *Id.* at 1934. The Court "express[ed] no view on the merits of the plaintiffs' case." *Id.* And the Court refused to "draw speculative and advisory conclusions regarding" issues it did not have to decide. *Id.* at 1931.

The Court did provide guidance, though, with respect to the appropriate *remedy* after vote dilution is proven: Relief should be tailored to correct the needless cracking and packing shown by plaintiffs who have suffered an injury in fact. "Remedying the individual voter's harm . . . does not necessarily require restructuring all of the State's legislative districts." *Id.* "It requires revising only such districts as are necessary to reshape the voter's district—so that the voter may be unpacked or uncracked, as the case may be." *Id.*; *see also id.* at 1930 ("[T]he remedy that is proper and sufficient lies in the revision of the boundaries of the individual's own district."); *id.* at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.").

That vote dilution standing and relief must be tethered to particular districts, of course, does not mean that this Court's statewide findings of fact and conclusions of law are irrelevant. To the contrary, they remain essential for several reasons. *First*, as the Supreme Court recognized, evidence that a plan as a whole was intended to benefit a party "may well be pertinent with respect to any ultimate determination whether the plaintiffs may prevail in their claims." *Id.* at 1932. Statewide discriminatory intent, in other words, may well be a requirement for liability to be imposed. Justice Kagan similarly pointed out that "evidence about the mapmakers' goals in formulating the entire statewide map . . . would predictably carry down to individual districting decisions." *Id.* at 1937 (Kagan, J., concurring). Statewide discriminatory intent, that is, would typically support inferences of district-specific intent as well.

These district-specific inferences may be based on district-specific evidence too: the mapmakers' expectations regarding how particular districts would perform, these

4

districts' actual election results, maps highlighting the districts' cracking and packing of the opposing party's voters, maps showing that the cracking and packing could have been avoided, and so on. Here, this evidence is either in the existing record or in the limited supplement to it that the League proposes. This Court should rely on this material to make additional findings that individual districts were deliberately cracked or packed to benefit Republican candidates and voters and disadvantage Democratic ones.

*Second*, turning from discriminatory intent to discriminatory effect, the impact of any kind of vote dilution can only be evaluated on a regional or statewide basis. In a one-person, one-vote suit, for example, liability hinges on the difference in population between the most and least populous districts in a plan. *See, e.g.*, *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983) (state legislative maps); *Karcher v. Daggett*, 462 U.S. 725, 730-31 (1983) (congressional maps). In a racial vote dilution case under Section 2 of the Voting Rights Act, likewise, racial polarization in voting is typically calculated across a multidistrict area. *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 52 (1986). The proportionality of minority representation—perhaps the most important factor in Section 2's totality-of-the-circumstances analysis—is also usually analyzed statewide. *See, e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 438 (2006) (noting that "it makes sense to use the entire State in assessing proportionality").

These tenets apply equally to *partisan* vote dilution. Statewide analyses like measures of partisan asymmetry and comparisons with computer-generated maps are critical to assigning liability. Just as Section 2 plaintiffs have not had their votes diluted if they are proportionally represented, supporters of a supposedly victimized party should

5

lose their claim if the challenged plan is not actually biased against them. The statewide analyses are also vital to crafting a suitable remedy. Just as Section 2 plaintiffs are only entitled to additional minority-opportunity districts up to the point of proportionality, partisan gerrymandering plaintiffs should only be uncracked and unpacked until the map is no longer skewed against them.

And *third*, with respect to relief, it may be as expansive as is necessary to undo the needless cracking and packing of plaintiffs with standing (without tilting the plan in their favor). If such plaintiffs live in only a few areas, "remedying [their] harm does not necessarily require restructuring all of the State's legislative districts." *Whitford*, 138 S. Ct. at 1921. But if such plaintiffs live throughout the State, a plan-wide remedy may be essential. "[W]ith enough plaintiffs joined together—attacking all the packed and cracked districts in a statewide gerrymander—those obligatory revisions could amount to a wholesale restructuring of the State's districting plan." *Id.* at 1937 (Kagan, J., concurring). "It all depends on how much redistricting is needed to cure all the packing and cracking that the mapmakers have done." *Id.*

## II. *Whitford* Has No Impact on the Court's First Amendment and Article I Holdings.

Proceeding to the Court's questions about *Whitford*'s implications, the Court first asked what impact *Whitford* has on the Court's First Amendment and Article I holdings. The League has only advanced a vote dilution theory of partisan gerrymandering in this litigation (under both the First Amendment and the Equal Protection Clause), and so takes no position on the operation of other gerrymandering theories. Nevertheless, it is

6

clear that *Whitford* has no bearing on these other theories. In her concurrence, Justice Kagan developed one such approach: a claim that gerrymandering burdens the associational rights of party members and officials. *See id.* at 1937-40. The Court, however, explicitly declined to analyze this claim, declaring that it "leave[s] for another day consideration of other possible theories of harm not presented here and whether those theories might present justiciable claims giving rise to statewide remedies." *Id.* at 1931. Given this statement, *Whitford* plainly does not undercut any other gerrymandering theory.

### III. The Existing Factual Record Is Not Quite Adequate to Establish Plaintiffs' Standing to Bring Their Vote Dilution Claim.

The Court's second question was whether the existing factual record is adequate to establish plaintiffs' standing to bring their vote dilution claim. It is not, though as discussed below, *see infra* Part IV, it requires only very limited supplementation. The existing record demonstrates that the 2016 Plan cracked and packed Democratic voters throughout North Carolina—and intentionally so. But the evidence admitted thus far does *not* prove that the cracking and packing were unnecessary—that is, that voters living in cracked or packed districts could instead have been placed, by a fair map, in uncracked or unpacked districts. Under both the majority opinion in *Whitford* and Justice Kagan's concurrence, such evidence is necessary to show standing in a vote dilution challenge.

Starting with the existing record, three categories of evidence reveal the 2016 Plan's deliberate cracking and packing of Democratic voters. *First*, Dr. Thomas Hofeller's own declaration specifies the Democratic and Republican vote shares he

7

anticipated for each district he drew. Ex.5116:9. Based on his seven-election average, Dr. Hofeller predicted that the Plan's ten Republican districts would have Republican vote shares from 54% to 58%. *Id.* He also predicted that the Plan's three Democratic districts would have Democratic vote shares from 63% to 69%. *Id.* These percentages are the telltale sign of cracking and packing. *Every* Republican district is safe but not too safe: virtually certain to be won by a Republican candidate by a comfortable, but not enormous, margin. And *every* Democratic district is overwhelmingly and inefficiently Democratic. This is the precise pattern that purposeful cracking and packing produce.

*Second*, a series of maps illustrate how the 2016 Plan's cracking and packing were achieved. Exs.4007-4015, 4066-4077. Each of these maps zooms in on a different part of North Carolina and is color-coded by precinct based on Dr. Hofeller's seven-election average. *Id.* Together, the maps show that the Plan systematically splits clusters of Democratic voters: Greensboro (divided between Districts 6 and 13), Fayetteville (divided between Districts 8 and 9), Asheville (divided between Districts 10 and 11), etc. The maps also depict how other Democratic clusters are submerged within larger masses of Republican voters: Winston-Salem (in District 5), Wilmington (in District 7), etc. The maps illuminate the cramming of the State's largest Democratic concentrations into a handful of heavily Democratic districts as well: District 1 (containing most of northeastern North Carolina's Democrats), District 4 (containing most of Raleigh-Durham), and District 12 (containing most of Charlotte-Mecklenburg).

And *third*, the 2016 election results prove that not only did the 2016 Plan aim to crack and pack Democratic voters throughout North Carolina; it also accomplished its

8

objective. Ex.1018. Every district that Dr. Hofeller predicted would be won by a Republican candidate was, in fact, won by a Republican. *Id*. And every district he predicted would be won by a Democratic candidate was indeed won by a Democrat. *Id*. Moreover, exactly as expected with a strategy of cracking and packing, the average margin of victory in Democratic districts was far larger than in Republican districts. The average margin in the former was 37 percentage points, compared to 21 percentage points in the latter. *Id*.

The evidence already admitted thus establishes the 2016 Plan's deliberate cracking and packing. What the evidence does not yet demonstrate is that particular Democratic voters, living in particular cracked or packed districts, could have been placed in uncracked or unpacked districts by a fair map. To be sure, the record shows that at least one individual plaintiff lives in each district in the Plan, Exs.3024-3038, 4046-4060, and that the League "has individual members who are registered Democrats living in each of North Carolina's thirteen congressional districts" who "support and vote for Democratic candidates and have an interest in furthering policies at the national level that are consistent with the Democratic Party Platform," Ex.4080. The record also includes Professor Jowei Chen's testimony about his thousands of computer-generated maps, Tr.I:153-215; Tr.II:142-64; Exs.2010-2011, as well as actual images of nine of these maps, Exs.4025-4033.

But the record does not include *individualized* information about any of Professor Chen's maps, let alone the districts comprising each of these maps. The record does not state, for example, how any specific map or any specific district performs in terms of Dr.

9

Hofeller's seven-election average (or any other measure of partisanship). This information was produced by Professor Chen and disclosed to defendants, but it was not entered into evidence. And without this information, this Court cannot make the findings required by the Supreme Court and Justice Kagan's concurrence in *Whitford*. This Court cannot conclude, that is, that cracked or packed Democratic voters could have been uncracked or unpacked by a map that satisfies North Carolina's nonpartisan criteria yet treats the major parties fairly without supplemental information.

## IV. The Court Should Authorize the Limited and Expedited Reopening of the Record to Enable Plaintiffs to Prove Their Standing.

This Court's third question for the parties was what additional factual development is necessary. The League believes that only a very limited and expedited reopening of the record is needed, consisting of supplemental declarations by just two witnesses (Professor Chen and Mr. Salinger). These declarations are enclosed with this brief as Appendices A and B. If they were admitted into evidence, in the League's view, no further factual development would be required. In fact, since the declarations contain no new analyses and merely disclose more data about testimony and stipulations already in the record, the declarants do not even have to be deposed. (Though if the Court ordered their depositions, the League would be able to make them available on very short notice.)

Professor Chen's declaration provides absolutely no new expert analysis. Instead, it supplies data about one of his computer-generated maps—Plan 297 in Simulation Set 2—which the League plans to use to establish standing. This map was selected using the following criteria: (1) it is one of the 1,000 maps in Simulation Set 2, all of which protect

10

*more* incumbents than the 2016 Plan and split *fewer* counties, Ex.2010:15-19; (2) it contains one district with a black voting age population above 40%, Ex.2011; (3) like most of the maps in Simulation Set 2, it contains seven Republican districts and six Democratic districts using Dr. Hofeller's seven-election average, Ex.2010:6, and exhibits an efficiency gap near zero, Ex.2010:33; and (4) of the maps that meet the preceding conditions, it has the most compact districts, on average.

Professor Chen's declaration provides maps of Plan 2-297 and each of its constituent districts. The declaration also provides the following data about each district: (1) its population; (2) its black voting age population share; (3) its Reock compactness score; (4) its Polsby-Popper compactness score; and (5) its partisan score using Dr. Hofeller's seven-election average. Again, this data was previously disclosed to defendants but not entered into evidence.

Professor Chen's declaration further specifies, for a list of precincts supplied to him by counsel, the following information: (1) in which district in the 2016 Plan each precinct is located; (2) what this district's partisan score is using Dr. Hofeller's seven-election average; (3) in which district in Plan 2-297 each precinct is located; and (4) what this district's partisan score is using Dr. Hofeller's seven-election average.

Salinger's declaration, in turn, is even narrower than Professor Chen's. It simply avows, for each precinct considered by Professor Chen that does not contain an individual plaintiff, that the precinct contains at least one League member who is a registered Democrat and who reliably votes for Democratic candidates in Democratic primaries. As mentioned above, the parties have already stipulated that the League has

11

members who are Democratic voters in every *district* in the 2016 Plan. Ex.4080. Salinger's declaration merely supplements this stipulation by identifying particular *precincts* where the League has members who are Democratic voters.

Based on Professors Chen's and Salinger's declarations, the Court would be able to make the findings that are necessary, under *Whitford*, to prove standing on a vote dilution theory. The Court would be able to find, in other words, that in each precinct considered by Professor Chen, the individual plaintiff(s) and/or the League member(s) (1) live in a cracked or a packed district in the 2016 Plan; but (2) live in an uncracked or an unpacked district in Plan 2-297. A district in which the Republican candidate prevails due to the cracking of Democratic voters, of course, can be uncracked *either* by replacing it with a Democratic district *or* by making it substantially safer for the Republican candidate. Either of these options causes Democrats' votes to "carry [more] weight"—to be wasted at a lower rate, thus yielding less dilution of their ballots. *Whitford*, 138 S. Ct. at 1931. A packed Democratic district, in turn, can be unpacked by making it substantially more competitive but still Democratic-leaning.

To illustrate the findings the Court could make, Appendix C is a list of proposed findings of fact, relying on both the existing record and Professors Chen's and Salinger's declarations. This list covers most, but not all, of the 2016 Plan's districts. No League member in District 3 (a cracked district with a Republican vote share of 55% using Dr. Hofeller's seven-election average) is placed in an uncracked district in Plan 2-297. The list also includes conclusions that each district in the 2016 Plan was *intentionally* cracked or packed. District-specific evidence of partisan intent is unnecessary to establish

12

standing. *See id.*, 138 S. Ct. at 1932 ("[T]he question at this point is whether the plaintiffs have established injury in fact. This turns on effect, not intent . . . ."). But as noted earlier, such evidence may be relevant to *liability* under a vote dilution theory. *See supra* Part I. In an abundance of caution, the Court should therefore find that each district in the 2016 Plan was deliberately cracked or packed in order to benefit Republican voters and candidates and disadvantage Democratic ones. These district-specific findings of partisan intent could be based entirely on the existing record, *see supra* Part III, though Professor Chen's and Salinger's declarations corroborate the findings by showing that each district's cracking or packing could have been avoided.

## V. The Court Should Briefly Reopen the Record Before Deciding Whether Plaintiffs Have Standing.

The Court's fourth and final question was whether plaintiffs have standing to bring their vote dilution claim given the record as it currently stands. In light of the above discussion, the League asks the Court to eliminate any doubt about plaintiffs' standing by (1) reopening the record to admit Professors Chen's and Salinger's declarations; and (2) finding, based on these declarations, that particular individual plaintiffs and/or League members who were cracked or packed by the 2016 Plan could have been uncracked or unpacked by a fair map.

## CONCLUSION

The League urges the Court to impose a strict timeframe for the reopening of evidence. Because it is preferable for the Supreme Court to consider this case during the 2018 term in order to avoid any disruption in implementing a remedy in time for the 2020

13

election, the League asks this Court to enter its final judgment on remand in September. To the extent that depositions are necessary or ordered, these depositions could easily be conducted in late July or early August, with a hearing in late August should the Court wish to entertain any further arguments (or deem it necessary to convene formally to receive the supplemental standing evidence). What this Court should not tolerate is any attempt to use the Supreme Court's clarification regarding the evidence necessary to establish standing—which, as explained herein, is minimal in scope—as an excuse to delay proceedings and avoid a remedy by 2020.

Respectfully submitted this 11th day of July, 2018.

/s/ Allison J. Riggs
Allison J. Riggs (State Bar # 40028)
Jaclyn A. Maffetore (State Bar #50849)
Jeffrey Loperfido (State Bar #52939)
Southern Coalition for Social Justice
1415 Highway 54, Suite 101
Durham, NC 27707
Telephone: (919) 323-3380
Facsimile: (919) 323-3942
allison@southerncoalition.org
jmaffetore@scsj.org
jloperfido@scsj.org
*Counsel for All Plaintiffs*

/s/ Paul M. Smith
Paul M. Smith
Campaign Legal Center
1411 K. St. NW, Suite 1400
Washington, DC 20005
(202) 736-2200
psmith@campaignlegalcenter.org

/s/ Ruth M. Greenwood
Ruth M. Greenwood
Annabelle Harless
Campaign Legal Center
73 W Monroe St, Suite 302
Chicago IL 60603
(312) 561-5508
rgreenwood@campaignlegalcenter.org
aharless@campaignlegalcenter.org

/s/ Nicholas O. Stephanopoulos
Nicholas O. Stephanopoulos
University of Chicago Law School
1111 E 60th St.
Chicago, IL 60637
(773) 702-4226
nsteph@uchicago.edu

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

I hereby certify that this brief complies with L.R. 40.1(c) because the total word count for the body of the brief including headings and footnotes is 3,721.

This 11th day of July, 2018.

/s/ Allison J. Riggs
Allison J. Riggs

# CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing BRIEF with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel and parties of record.

This 11th day of July, 2018.

/s/ Allison J. Riggs
Allison J. Riggs